# MARY S. McINTOSH v. JOHN B. GOODWIN.
## —292 S. W. (2d) 242.

Western Section. May 25, 1954.

Petition for Certiorari denied by Supreme Court, September 6, 1954.

Burch, Porter & Johnson, Memphis, for plaintiff in error.

Chandler, Shepherd, Heiskell & Williams, Memphis, for defendant in error.

AVERY, P. J., (Western Section). This suit originated in the Circuit Court of Shelby County, and grows out of an injury received by Mary S. McIntosh when she fell through an opening built in the ceiling of a house at 3406 Northwood, Memphis, Tennessee in which fall she received a compression fracture of the body of the first lumbar vertebra which required hospital confinement for about one month, enclosing her body from the collar bone down to the junction of the body with the lower extremity in a plaster cast. That injury resulted in the development of thrombophlebitis in her left leg which also required an operation to remove aspirating blood clots from the vein and tying off the vein. These injuries are permanent and

result, in the opinion of Dr. J. J. McCaughan, in a 15 to 20% permanent disability. Mrs. McIntosh was working for Levy's, a mercantile establishment in Memphis, at the desk in the Shoe Department and for which work she was receiving $350 per month at the time of her injuries.

The house in which she received her injury had been deeded to her and her husband, R. E. McIntosh, as tenants by the entirety pursuant to a sale contract entered into by and between them and James B. Goodwin, the defendant, on November 17, 1951, copy of which contract is filed as Exhibit A to her testimony, which contract is on the form approved by the Real Estate Board of Memphis, much of which is printed and which, with other provisions general to such contract contains the following:

"It is understood and agreed that if the title is not good and cannot be made good within a reasonable time after written notice has been given that the title is defective, specifically pointing out the difficulty, then this earnest money which has been deposited with the undersigned agent, shall be returned to the purchaser and the usual commission shall be paid the agent by the seller, and this sale is to be null and void."

The above contract called for the payment of $8,000 in cash and the conveyance by the purchasers to the seller of real estate at 1947 Snowden Avenue, valued at $12,500.

On the 3rd day of December, 1951 the seller, John B. Goodwin, conveyed by his warranty deed to R. E. McIntosh and his wife Mary S. McIntosh, the plaintiff, the property described in the sales contract located at 3406 Northwood, by his warranty deed. This deed is made

Exhibit D to the testimony of Mrs. McIntosh and contains the following restrictions:

"This conveyance is made subject to restrictions as shown on plat of record in Plat Book 13 page 29, in the register's office of Shelby County, Tennessee; also subject to 20 ft. easement for utilities and ditch across the north part of the property; also subject to 6 ft. storm drain easement over the west part of the property."

By deed dated 1st day of December, 1951 R. E. McIntosh and wife, Mary S. McIntosh, the plaintiff conveyed to John B. Goodwin, by proper description, the property described in the sales contract located at 1947 Snowden, Memphis, Tennessee. Certified copy of this deed is made Exhibit E to the testimony of Mrs. McIntosh. Both the foregoing deeds were acknowledged on the 3rd day of December 1951, and presumably were simultaneously exchanged.

It is insisted by the plaintiff that this deed from John B. Goodwin to her and her husband was accepted with the express provision, entered into verbally at the time the deeds were exchanged, that in event the 6 ft. storm drain easement over the west part of the property was found to be located partly under the dwelling erected on that lot, the transaction was to be rescinded, and its exact location was to be ascertained by a survey. The record discloses the fact that the survey was made, and this storm drain found to be under part of the dwelling, and that the plaintiff and her husband though having moved into this dwelling on about the 8th of December, 1951, never unpacked all of their household furnishings, clothing etc. pending this determination by the survey and that

they demanded a rescission of the contract, but on January 18, 1952, because of the failure of title in accord with the provisions in the sales contract, in that the storm drain easement was located partly under the dwelling, and in accord with the oral agreement made with defendant or his agent, at the time the deeds were exchanged plaintiff and her husband agreed to take the property located at 3444 Northwood Drive, which belonged to and was built by defendant, in the place and stead of the property located at 3406 Northwood Drive, and pay an additional thousand dollars in cash over and above the amount of cash to be paid under the original sales contract for the property at 3406 Northwood and that on that particular date, John B. Goodwin, the defendant conveyed to them in accord with the oral agreement, by his deed, copy of which is Exhibit F to the testimony of Mrs. McIntosh, this lot and dwelling located at 3444 Northwood Drive.

On January 22, 1952 R. E. McIntosh and the plaintiff executed deed to John B. Goodwin by which they reconveyed the property located at 3406 Northwood Drive to him. These last two deeds appear to have been exchanged by the parties on January 23, 1952, (Statement of Mr. McIntosh R. 84 and settlement sheet dated January 23, 1952, Exhibit 1 to his testimony). Both deeds were filed for record on January 25, 1952.

Mrs. McIntosh was injured, as hereinbefore stated by the fall described, on January 20, 1952, and was in the hospital at the time the deed re-conveying 3406 Northwood to Goodwin was executed. This deed is Exhibit G to the testimony of Mrs. McIntosh.

Without quoting extensively from the declaration it alleges (a) that at the time Mrs. McIntosh was injured she was a temporary tenant of the defendant John B. Goodwin and that while walking through the attic of the dwelling located at 3406 Northwood Drive, she fell through this opening left for the attic fan which was filled with insulation material and "debris" making it difficult to see and observe and alleges the filling of this space and the failure on the part of the defendant to inform her that this so-filled opening was unsafe to walk upon constituted negligence on his part, and (b) that defendant Goodwin was a builder of houses and that he built this house at 3406 Northwood Drive leaving this opening for an attic fan which he filled with insulating material from above and covered beneath with a thin material the same color of the ceiling as viewed from the lower floor, which construction created a nuisance and that he failed to warn or inform the plaintiff of such nuisance at the time he conveyed the property to them, all of which constituted negligence on his part and that this negligence of the defendant was a direct and proximate cause of plaintiff's injury.

The declaration is in two counts incorporating in the first account the negligence shown above under "(a)" and in the second count that shown above under "(b)" and she seeks to recover damages in the amount of $75,-000 for her injuries.

The suit was instituted by both Mary S. McIntosh, the plaintiff-in-error in this Court and her husband R. E. McIntosh. Counts I and II stating the cause of action by Mrs. McIntosh and Counts III and IV stating a cause of action by Mr. McIntosh. However, on proper motion a non-suit was allowed to R. E. McIntosh during the trial

of the case, and we are in no wise concerned with his alleged damages.

To the declaration the defendant filed a general issue plea and a plea of contributory negligence. Upon motion of plaintiff the defendant was required to file special pleas, wherein the entire transactions between the original plaintiffs and defendant were set forth in minute detail denying every specific allegation of negligence alleged in the declaration and further specifically pleading as follows:

"That there was no relation of landlord and tenant existing between plaintiffs and defendant at the time of the accident complained of or at any time prior thereto."

"That the premises where the accident complained of is alleged to have occurred was sold by defendant to the plaintiffs pursuant to the terms of a written contract between them and that said sale was consummated and in all things became final on the 3rd day of December, 1951."

The pleas further show the execution and recording of the deeds passing between the parties; the occupancy of the premises at 3406 Northwood Drive by the plaintiffs; that the dwelling on the lot where the injury occurred was constructed in accordance with plans prepared by a regular licensed architect; was inspected at intervals during construction by the building inspector of the city of Memphis or his authorized deputy and approved by the inspector; that it was constructed to meet the standard requirements established by the Federal Housing Administration; that the design and construction of the opening

through which plaintiff fell exceeded the standards required by the Federal Housing Administration and the Building Department of the City of Memphis and that the location of the opening in the ceiling for the attic fan is in accord with good practice and customary methods of construction; that the attic was lighted and the lighting thereof controlled by a switch at the foot of the stairway; that the plaintiffs inspected the building before they accepted the sales contract and the deeds and that they knew or by ordinary care should have known of the position and condition and construction of the opening; that the absolute title to the property where the injury occurred had passed from the defendant to the plaintiff prior to the injury, possession taken by them and that they were guilty of such contributory negligence as to prevent a recovery under any circumstances.

The case was tried to a jury and the court on November 16, 1953, and at the conclusion of the proof by the plaintiff motion was made by defendant for preemptory instructions. This motion was granted, verdict entered in accord therewith and judgment dismissing plaintiff's suit, to which action plaintiff objected, preserved her exceptions, prayed, obtained and perfected her appeal to this Court, and has assigned errors.

These assignments of error are leveled solely and alone to the action of the Court in directing verdict for defendant, and aver the errors to exist because (a) there was competent material evidence to support a verdict for plaintiff, (b) the evidence and all reasonable inferences to be drawn therefrom in favor of the plaintiff showed that plaintiff suffered injury and damage due to the negligence and breach of duty owed her by the defendant and that defendant's negligence was the direct and proxi-

mate cause of plaintiff's injuries, (c) that the evidence and all reasonable inferences to be drawn therefrom showed that at the time of the accident plaintiff occupied the premises as the tenant of defendant, and that plaintiff's injury and damages were the direct and proximate result of the dangerous and difficult condition in the premises created by defendant, (d) that there was competent and material evidence that defendant as a contractor negligently breached his duty to plaintiff by creating a dangerous and concealed condition in the attic and failed to notify plaintiff thereof and (e) that such action on the part of the defendant created a nuisance on the premises and that said injuries directly resulted from the negligence of defendant in creating such nuisance.

As we view the record, the assignments of error, briefs and arguments of the parties pose but two questions for decision by this Court as follows: (1) Was the plaintiff occupying the premises where she was injured as tenant or a vendee of defendant? (2) Did the defendant, because of the fact that he planned and built the dwelling where plaintiff was injured, and which was later sold and conveyed by him to the plaintiff or plaintiff and her husband who took possession of and moved into the dwelling, become liable for injuries received on account of some defective construction or dangerous condition of the building, if such defective condition created a nuisance to accupants owning same?

The learned Trial Judge, in a lengthy comment, wherein he analyzed the entire transaction, in part, said:

"I do not believe that the relationship of landlord and tenant existed at that time. I don't think that relationship existed at all and the case of Smith v.

Tucker [151 Tenn. 347, 270 S. W. 66, 41 A. L. R. 830] is applicable. The most that can be said is that they had a claim against Mr. Goodwin, for this encroachment, and that is all their discussion entered into at Mr. Lacey's office was as to this encroachment, and nothing else, which has no relation to the other part of the house or the opening provided for the attic fan. However, that may be, in passing from that question, I am of the opinion that the plaintiff's proof in this case fails to show any negligence on the part of Mr. Goodwin.''

In referring further to the question of contributory negligence he said:

''So I am of the opinion that the evidence in this case fails to show any negligence on the part of the defendant because he constructed his home with the opening up there for the future instalaltion of an attic fan. And, furthermore if it can be said that the defendant should have done something about that, I think the plaintiff is the author of her own injury. The proof shows that the attic was amply lighted. She could see that portion of the attic that was floored and if she had looked down before she stepped she would have realized that if she did step on this unfloored portion of the attic and stepped on that insulation that she would fall through or something would happen to her or the very thing would happen to her that did happen to her.''

The record reveals the fact that after the execution of the sales contract, and when the deeds were to be exchanged whereby the property owned by plaintiffs was to be conveyed to defendant and the property at 3406

Northwood Drive conveyed to the plaintiff each party was represented by counsel. The transaction occurred in the office of Mr. Lacey, counsel for defendant and plaintiffs were accompanied to that office by Mr. Johnson, counsel for plaintiffs. Both are reputable attorneys. It is undisputed that R. E. McIntosh had told Mr. Goodwin's representative, Mr. Kenworthy, the real estate dealer who had suggested that no attorney was necessary other than Mr. Lacey, that either ''Jessie,'' meaning Mr. Johnson or ''John,'' meaning Mr. Porter, of the law firm who represents plaintiff in this case would advise him and be present at the closing of the deal. Mr. Johnson was the attorney who accompanied plaintiffs to Mr. Lacey's office, and who testified as a witness in this case. Upon his testimony, supported by that of Mr. and Mrs. McIntosh, the plaintiff rely for the fact that there was an oral agreement to rescind the contract and that the contract was actually rescinded before the injury to plaintiff, after which plaintiff and defendant occupied the position as tenants of a landlord. The testimony of Mr. Johnson and of Mr. and Mrs. McIntosh, on this point is quite interesting and in view of the contention of the parties it is proper that the principal statements of each witness, bearing upon that particular matter be shown in this opinion. The witness Johnson, at pages 116 and 117 of the record was asked and answered as follows:

''Q. Now, was any investigation made at that time by Mr. Kenworthy to determine whether or not the house did rest on the easement? A. Yes; Mr. Kenworthy—, we discussed it at great length and he first went downstairs, presumably to Mr. Goodwin's office, or called him on the telephone, I don't recall which, but did have some contact with Mr. Goodwin's office,

516

and then came back and said he was sure that the house didn't encroach on the easement.

"Q. Now, was any agreement entered into with reference to making a survey to make certain that that statement was an accurate and true statement? A. Yes, because if the thing settled on the easement, that could mean that Mr. McIntosh would have to tear down his house, or might not be able to sell it when he wanted to; so, we had a very clear understanding that Mr. Kenworthy would get a survey showing the location of the house with relation to the lot lines particularly with relation to the storm sewer easement, and furnish that to Mr. McIntosh promptly.

"Q. Now, Mr. Johnson, why did you go ahead and let the deeds be executed and delivered if you had the agreement outstanding; just how did that come about? A. Well, we were right up to the closing, and Mr. and Mrs. McIntosh had the money there and the deeds were ready; we had this very clear understanding with Mr. Kenworthy that we would get the survey, that if the survey showed that the house did encroach over on the easement, that we could undo or rescind the trade, and I just thought it was perfectly safe and proper to let him close the trade, especially where he gave us assurances that it didn't set on the sewer, and those were things learned by me when I let Mr. McIntosh pay the money and accept the conditional delivery of the deed."

At page 79 of the record R. E. McIntosh was asked and answered the following questions:

"Q. Now, I will ask you the question again, did a discussion arise in connection with that easement that you just described? A. Oh yes; Mr. Johnson asked for a survey and Mr. Kenworthy went to the telephone and called someone and then he came back and said, 'We don't have a survey but we will get you one.' Mr. Johnson then said we would close the deal subject to the survey. In other words that there was no encroachment or easement there.

"Q. Now, what was your attitude and the attitude of Mr. Johnson with reference to buying a house that was located on an easement owned by someone else; did you want to buy a house under those circumstances or not? A. It was understood there that if there was any encroachment on the easement that the deal was off; that was definitely understood at that time."

At pages 34, 35 and 36 of the record Mrs. McIntosh was asked and answered the following questions:

"Q. When you arrived at Mr. Lacey's office would you tell us if any discussion came up with reference to any easement on the property. A. Yes; after we had handled quite a bit of the matter Mr. Johnson had a plat showing the location of the house we were buying, and he asked them regarding the 6 foot easement that was provided for on the plat, he asked Mr. Kenworthy did he have the survey as to where the house was to be built. He asked Mr. Kenworthy did he have a survey since the house was built, showing where the house was built on the lot, and Mr. Kenworthy said they were in the process of making it, and Mr. Johnson said this is very important and I

want to know for sure the house is not on the 6 foot easement, and Mr. Kenworthy said, 'I am sure it is not, but I will call Mr. Goodwin,' and he picked up the telephone, he called someone and when he got off of the phone he said he was sure that the house was not on the easement, that he, Mr. Goodwin, had stepped the foundation off himself, and that was the end of the conversation. However, Mr. Kenworthy had previously stated that he had a lot on his mind and he did not know.

"Q. Mrs. McIntosh, was any conversation had at that time with Mr. Kenworthy, Mr. Goodwin's representative with reference to what effect would be given to a survey if a survey developed that the house was sitting on the easement? A. After Mr. Johnson had raised the question of the survey and Mr. Kenworthy had called Mr. Goodwin, Mr. Johnson said, 'Well, I don't think it is enough for you to hold up closing the deal on account of this; Mr. Goodwin is very reasonable and reliable, whatever he says he will do he will do, and we will close the deal contingent on the fact if the survey shows the house is not built on the easement all right, and if it is not you will be buying a house; in other words, we will close the deal contingent on the fact it is not built on the easement,' and it was agreed that Mr. Kenworthy was to get the survey."

The rule of caveat emptor generally applies to sales of land. The vendor does not owe purchaser duty to disclose to him dangerous conditions of premises. Smith v. Tucker, 151 Tenn. 347, 270 S. W. 66, 41 A. L. R., 830; Evens v. Young, 196 Tenn. 118, 264 S. W. (2d) 577, 581.

There is no necessity to minutely review the decisions in the above cases. Justice Gailor, in the case of Evens v. Young, supra, quotes extensively from the Tucker case, supra, and he also refers to and approves the holding of the Court of Appeals in the case of Ropeke v. Palmer, 6 Tenn. App. 348, 353-354. In which case the Court of Appeals followed the rule in the Tucker case and approved a quotation from the Palmer case as follows:

" 'The court holds that the vendor does not owe to the purchaser the duty to disclose to him dangerous conditions of the premises. That the same rule does not apply between vendor and vendee as between landlord and tenant. The opinion is elaborate and exhaustive. It covers this case with a margin to spare unless the plaintiff in the instant case can prevail upon the Supreme Court to overrule the Smith v. Tucker case, we see no hope for him to succeed. Therefore, it seems useless to encumber this opinion with further citation of authority. In fact that case seems to go so far as to say that even proof of actual knowledge on the part of defendant of defects in the house would not have rendered him liable.' "

Thus the Court of Appeals analyzed the meaning of the decision in the Tucker case, and the Supreme Court has approved that analysis. The rule seems exceedingly harsh to be made to apply to every case where a vendor conveys real estate, with defective construction, resulting in injuries to the vendees or members of their families. There seems, however, to be no exception to the rule, unless it could be found in the grossest type of fraud, and the Supreme Court of Tennessee having so recently spoken through Justice Gailor in the case of Evens v. Young with approval of the holding in the Tuck-

er case, if the facts of the case now being considered are legally parallel with those of the Tucker case, this Court feels bound by that opinion.

"Whatever may be the reason, no case can be found in the books where the vendor has been held liable in damages to the vendee or to third persons, for personal injuries arising from defects in the premises.

"Whether this be on grounds of public policy, or because the rule of caveat emptor governs, and no warranty will be implied (Williston on Contracts, vol. 2, sec. 926), or whether it be because the precedent negotiations are supplanted by the deed when the vendee receives it (27 R. C. L. 529), or whether the reason is to be found in the fact that the delivery of the deed practically terminates the relation of vendor and purchaser, whereas the relation of landlord and tenant is a continuing one, or whether such damages are not supposed to be within the reasonable contemplation of the parties—whatever be the reason, the fact remains." Smith v. Tucker, supra, 151 Tenn. at page 362, 270 S. W. at p. 70.

■ ■ It can be seen from the foregoing quoted testimony that there was an oral agreement with respect to a rescission of the exchange and conveyance of the respective properties by virtue of the sales contract, but there is nothing in them, that we are able to see, which indicates that the rescission is to be executed by conveying different property from that described in the deed as located at 3406 Northwood Drive or to mean that the oral agreement to rescind, on certain conditions, meant that plaintiffs would purchase other property from the defendant

as a result of such an agreeemnt to rescind, or that defendant would deed other property to them, all of which it is admitted by them that they did, and there was conveyed to them the property at 3444 Northwood Drive. We concede from the proof that the agreement had been entered into prior to the accident which resulted in plaintiff's injury, that 3444 Northwood Drive would be conveyed to her and her husband, because of the fact that the house at 3406 Northwood Drive rested upon a portion of the drain pipe and the easement which it occupied, we cannot conceive that such an agreement created the relationship of landlord and tenant as to 3406 Northwood Drive. Nothing of that nature seems to have been embraced in the one oral agreement first made in Mr. Lacey's office, and had the alleged rescission agreement embraced other property than that described in the two deeds being exchanged in Mr. Lacey's office at that time, the Statute of Frauds, T. C. A. sec. 23-201, would apply.

In support of plaintiff's contention that the relationship of landlord and tenant did exist between the parties at the time of the injury, the case of Winnard v. Robbins, 22 Tenn. 614 is relied upon as authority for such contention. The case of Winnard v. Robbins is an ejectment suit to recover two lots in McMinnville, Tennessee. In that case neither the plaintiff nor defendant had a legal title to the real estate in question, and defendant had entered upon the real estate as a tenant. The Court found that since neither party had title to the land in dispute, the position of defendant was a better one than that of the complainants, both being trespassers. The proof showed that one Jewel took possession of the land in 1831 under the plaintiff, recognizing his title, and upon a verbal contract of purchase, which appears never to have been

completed, then Jewel improved the lots and remained in possession until 1837, when he left the country, previously thereto in 1835 having sold and conveyed the lots to one Dick and H. R. W. Hill who took possession, first by one Young, and then by the present defendant. The Trial Court, in that case charged the jury that "If the proof satisfied them that Jewel originally rented the place from the plaintiff, and, after having occupied it as a tenant had made a verbal contract of purchase, and continued the possession under the contract, he would yet be his tenant at will, and, as such would be estopped from disputing plaintiff's title unless he had set up to hold adversely for 7 years with the knowledge of the plaintiff."

The Supreme Court in referring to that statement said:

"In this the Circuit Judge was surely right and there can be no pretense that there was any such continued adverse possession as would change the relationship as was proved to exist between the parties, the only question left is whether the relationship did exist and to what extent."

We do not think this case is authority to support the contention of plaintiff.

For further support of plaintiff's position in this particular regard they rely upon the case of Osborn v. Stevens, 132 Conn. 410, 45 A. (2d) 160. That case is distinguishable from the case before us because of the fact that no deed was ever executed. The parties went into possession under an oral agreement to purchase. After occupying the property for some 3 years Osborn informed Stevens that he could not carry out the contract because he could not raise the money, Stevens had a deed

made out to Osborn transferring title to him, with a mortgage deed back to him from Osborn, in accordance with the terms of the oral agreement, and because of Osborn's refusal to perform, the deeds were never executed and Osborn continued to occupy the premises as a tenant paying what is referred to in the case as an agreed rental until the time of his death. Under the facts of the case it was held that Osborn was a tenant from the time that he refused to perform under his oral agreement to purchase. The suit was for specific performance by the administratrix of the estate of Osborn against the widow and sole heir of Charles M. Stevens. The plaintiff failed in that suit.

■ We find no fault with plaintiff's contention that the statute of frauds does not cover an oral agreement to rescind a written contract and we think the cases of Walker v. Wood, 31 Tenn. App. 196, 213 S. W. (2d) 523, and Early v. Street, 192 Tenn. 463, 241 S. W. (2d) 531, furnish ample support for such contention by the plaintiff, but we are unable to apply the facts of those cases to the instant case so as to bring the plaintiff into the relationship of landlord and tenant.

■ Unquestionably, the way the opening in the attic of the dwelling at 3406 Northwood Drive was constructed, and its upper surface concealed with a grayish colored loose insulating material, with the knowledge on the part of the builder that people who would occupy that dwelling most certainly would use the attic for storage purposes as well as to make inspection of the utility units stationed therein, created a private nuisance. The permanent stairway was placed there as an entrance and exit to the attic for such uses. A private nuisance is defined as "one which violates only private rights and produces damages

to but one or a few persons." 39 Am. Jur., Nuisances, sec. 9, p. 287.

However, it cannot be said that such a nuisance, thus created, and because of which a severe injury was inflicted upon the plaintiff, furnishes any more legal grounds for recovery against the vendor than the careless construction of the mantel in the Tucker case, which brought death to a member of the owner's family. In each of the cases such construction created a dangerous condition for the occupants who purchased the respective dwellings.

While the rule laid down in the Tucker case may be exceedingly harsh, we feel constrained and bound to apply that decision to the instant case and to overrule all the assignments of error. As said in the case of Ropeke v. Palmer, supra, by Judge Heiskell, who wrote the opinion for the Court, "Unless the plaintiff in the instant case can prevail upon the Supreme Court to overrule the Smith v. Tucker case we see no hope for him (her) to succeed."

Considering all the evidence and the inferences to be legally and factually drawn therefrom most favorable to the plaintiff, and having held the Tucker case to be controlling, there are no competent issues to submit to the jury. The two questions posed must be answered in the negative, thus favorable to the defendant.

The result is, therefore, that the judgment of the Circuit Court of Shelby County, directing a verdict in favor of defendant, rendering judgment thereon and refusing to grant plaintiff a new trial is affirmed with cost against the plaintiff and her sureties on her cost bond. Judgment will be entered here accordingly.

Carney and Bejach, JJ., concur.